EDWARD S. FARROW, Respondent, *v.* HOLLAND TRUST COMPANY and Others, Appellants.

*Conspiracy — equity — participation of an officer of a corporation in a swindling scheme — corporate remedy by a stockholder's suit where the corporation does not sue — misjoinder of causes of action — usury in buying paper from a corporation.*

Application of the principle that a suitor in a court of equity must come therein with clean hands.

The participation of an officer of a corporation in a swindling scheme does not deprive the corporation of the right to attempt to recover by all legal means the moneys out of which it has been unlawfully and wrongfully swindled.

The complaint in an action charging the defendants with fraud and conspiracy set out two causes of action, one for grievances of the plaintiff individually, and the other for injuries inflicted upon the corporation of which he was a stockholder and an officer. The judgment granted by the trial court decreed relief upon both causes of action. The cause of action in favor of the plaintiff was predicated upon the theory that by false representations he was induced to assign to certain of the defendants, without consideration, two mortgages, together with certificates of stock of, and claims against such corporation, one of which mortgages, it was stated, was assigned as collateral security only, and was alleged in the complaint to have been since assigned to another person by the plaintiff, subject to such first assignment.

*Held,* that with respect to such mortgage the plaintiff had no right to bring· an action and obtain a judgment directing the same to be reassigned to him ;

That, in the absence of proper allegations excusing the failure of the corporation to bring a suit in its own behalf, the plaintiff was in no position to sue or obtain judgment in behalf of such corporation;

That two separate and distinct causes of action, one in favor of the plaintiff and one in favor of the corporation, could not be tried in such an action, nor could the rights of the corporation or of its creditors be adjudicated therein.

No matter what the discount may be, usury cannot grow out of buying paper from a corporation, even where the paper is made for the corporation's accommodation.

APPEAL by the defendants, Holland Trust Company and others, from an interlocutory judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the city and county of New York on the 20th day of July, 1892, upon a decision of the court rendered after a trial at the New York Special Term.

*George H. Van Hoesen,* for the appellants.

*Alexander S. Bacon,* for the respondent.

O'BRIEN, J. :

Seldom is the court called upon to pass upon a record containing so many and conflicting questions of fact as are here necessary to be resolved in order to determine what relief, if any, should be accorded to the plaintiff.

Such a determination, involving an examination into the transactions of individuals and their relations to a company projected for the purpose of fostering a large land scheme, renders it impossible to reduce the facts into anything like a brief statement. Starting out with fair prospects of success, the company met with misfortunes until such time as the money of the original projectors was exhausted, when resort was had to divers plans to raise funds, to secure which required the making of notes, the execution of mortgages, and the marketing of the same, in order to keep the enterprise alive, and all of which, when catastrophe has come, are now the subject of inquiry and question, demanding, that they may be understood, the examination of a most voluminous record. Apart, moreover, from the loss of money involved, much more important is the loss of character, which, if the charges made could be sustained, would result to some of the individuals and corporations who became interested in the enterprise. The importance of the case, therefore, not only in a monetary sense, but from the charges made of fraud, abuse of trust and conspiracy, can alone justify the tiresome recital of facts which we are compelled to enter upon.

The record shows that the plaintiff, in 1886, was the owner of 3,076 acres of land in Ocean county, N. J., the title to 2,586 of which had been transferred in July, 1889, to John B. Larner, a lawyer, of Washington, D. C. A portion of Larner's land, containing 311 acres, known as Barnegat Park, had been surveyed and laid off in streets by plaintiff under Larner's employ, and lots sold to various parties, when, in August, 1889, the Barnegat Park Company was organized as a corporation under the laws of New Jersey, with a capital stock of $300,000. Larner became president, and plaintiff secretary and treasurer. In October, 1889, the portion of Barnegat Park remaining unsold, viz., 303 acres, was conveyed by Larner to the company, Larner taking in full payment of the land 2,996 shares of the stock (all of the stock of the company except four shares). By various deeds of conveyance the company also obtained title to about

6,000 acres of land, including that formerly owned by plaintiff, and, in addition, the company holds quit-claim deeds to certain other land which has never been surveyed, but which plaintiff states contains about 8,000 acres, the title to which has never been traced on the public records.

Larner wishing to retire from the presidency, Marcus W. Conkling, the plaintiff's partner, came in as president, and Larner sold all his stock to plaintiff and Conkling, retaining only a small mortgage interest in the company, under an unrecorded mortgage dated March 14, 1890. Plaintiff was an officer in the United States army. Conkling, as president, and plaintiff, as secretary and treasurer, continued the business of the company, which was selling lots. A hotel called "The Pines," was built and opened, and efforts were made to sell lots to officers in the army and navy, the design being to make the park an army and navy resort. They made some sales, but on the installment plan. The purchaser of a lot would make a small payment in cash, and give his notes, maturing at intervals of a month or three months. A deed of the property would then be made to the purchaser, containing what in New Jersey is known as a vendor's lien clause for the unpaid balance of the purchase money. Indorsed on the note was a statement of the amount of the purchase price, the amount of cash paid, and that the remainder was secured by vendor's lien ; this was signed by the maker of the note. The note was then offered for discount, and, if taken, the deed was to be deposited with the note.

In the latter part of 1889, Conkling individually, and on behalf of the Barnegat Company, opened an account with the Holland Trust Company ; and in April, 1890, the plaintiff, having prepared the way in a letter written to Conkling, which was shown to Van Siclen, the secretary of the trust company, proposed to open an individual account with the trust company under conditions thus stated in his letter :

"I inclose the $1,125 note, previously referred to, for consideration.

"It has occurred to me that I might open a personal account with Holland Trust. I could then from time to time submit to you items which I personally receive on sales of lots for individuals — not company sales. For instance, I have to-day sold for Capt. Sny-

der Lot No. 9, Block 25, and on this sale I have a 4 mos. note, $500. I have this note subject to a 10% off the face. On all this paper I can divide the discount — making it 5% off on such as you can conveniently handle. I have heretofore used this paper in Baltimore. If you think well of this idea let me know, and I will send you some funds and open account."

April 22, 1890, Van Siclen replied:

"Lieut. E. S. FARROW:

"My DEAR SIR.— In regard to your personal account, we can from time to time take some of those notes as indicated by you in yours of 21st; I understand that they will always be notes of officers of army or navy, & the first liens on property sold, and for not over half the prices actually received from sales. So, you can, if you please, open such account."

April 26, 1890, Van Siclen wrote to plaintiff:

"Yours of the 24th received with three notes inclosed, which I have discounted, and placed $1,145.36, net amount, to the credit of your personal account.

"I will occasionally take notes of civilians, where at least one-half cash has been paid upon the property; but you must always give me lot and block numbers, prices, and correct address of maker."

April 28, 1890, plaintiff replied:

"My dear Mr. VAN SICLEN.— Yours of the 26th at hand this morning. All right. I will from time to time send you some items of paper made by civilians for lots bought from me personally. I have a large quantity of this paper which will soon be within 4 mos. of maturity. I am not in need of the proceeds of these discounts, therefore, whenever I send you such items, you need not trouble to submit them to your board, unless you think your board at such times would desire them. I will always reinvest the proceeds of such discounts in Park Company paper, or in company lots, which I can either hold until maturity, or rediscount at a profit, when such paper comes within 4 mos. limit. These lots I can always sell for cash & good notes."

And on April 30, 1890, plaintiff wrote to Van Siclen:

"I inclose some notes for personal account. Take any you may desire, and either return me the balance or keep them until such time as you might desire them. * * * ·

" The inclosed Stanton notes are ' Civilian ' notes. Stanton has just purchased the two cottages opposite the hotel, and is to-day moving into same for permanent residence."

Besides notes given for genuine sales of land, what plaintiff calls " accommodation notes," with the accompanying vendor's lien, were prepared, signed by employees of the Barnegat Company, laborers, and others of no responsibility.

In July, 1890, one Orson Adams became connected with the company, and August 13th was made president on the strength of representations that he would bring into the company $50,000, and Conkling became vice-president.

Plaintiff claims that he never negotiated any of the so-called accommodation notes himself, but that he prepared the deeds accompanying some of them and sent them to the New York office, where loans were obtained upon them. As to others, where he did not know the makers, and assumed that they might be accommodation makers, he prepared the deeds, but did not deliver them, but that on every note of that character made to his knowledge he now holds the deed in trust. As against this, he testifies that all such paper made to his knowledge was intended for the Holland Trust Company only, because that was the only place where such paper was understood to be acceptable, and that for every accommodation note legitimately discounted by Van Siclen or the Holland Trust Company he delivered with the note the vendor's lien deed ; but that they got some notes they did not legitimately discount, and for them they have not got the deeds. It would appear that the difference between legitimately and not legitimately discounting a note lay in the fact whether plaintiff or some other person, as, for instance, the president of the company, presented the note. As to particular accommodation notes called to his attention, he says they were prepared with his full knowledge and consent; that the amount was designated by defendant Van Siclen, who received a bonus of fifty dollars each on their discount. If plaintiff is to be believed, Van Siclen was not as particular about the high grade of the notes he or his company discounted as his letters indicate, but knew that many of the notes received from plaintiff were accommodation notes, the makers of which had merely gone through the form of buying lots and had paid no money down, and were not expected to pay the

notes at their maturity; a bonus being attached to each note of that kind, which Van Siclen was to get, and the more there were of them the better Van Siclen was suited. Though most of the so-called accommodation notes representing fictitious sales of land were marketed subsequent to the connection of Adams with the Barnegat Company in July, 1890, it is a significant fact, as shown by plaintiff's own evidence, that from the very first some sales, as well as notes which were subsequently discounted through Conkling & Farrow by the trust company, were not *bona fide.*

Van Siclen denies that he knew the character of any of the so-called accommodation notes, or that any of the bonuses were for his personal benefit, and says he did not find out till January, 1891, that any of the notes were accommodation notes, when Schramme, a creditor, accused plaintiff, in Van Siclen's presence, of having made these sham notes, and that plaintiff then silently admitted their untrue character. Van Siclen then requested a statement from plaintiff of the amounts of such notes as the Holland Trust Company held; this the plaintiff promised to furnish, and soon afterwards gave Van Siclen a list in his own handwriting, which has been offered in evidence.

Large quantities of such notes were discounted by Ladenburg, Thallman & Co., Southern National Bank, People's Trust Company, Kaufman Simon and Van Siclen. It is claimed by plaintiff that these notes, or some of them, were stolen from him by Adams, the president of the Barnegat Company, and James A. Simmons, who was a friend of Adams. That this version is not entirely correct, and that plaintiff's other statement is true, that from the first fictitious notes were used, is evidenced by a note made as far as back as March 26, 1890, which states, over plaintiff's own signature, that a large part of the purchase price on six lots had been paid by the maker, who turned out to be a poor retired army officer, and who, plaintiff testified, "went through the ceremony of buying lots."

In August, 1890, the defendant Schramme, who was then connected with the firm of Ladenburg, Thallman & Co., began discounting notes for the Barnegat Company; the proceeds were handed over to Simmons, who presented the notes. When the checks came back Schramme found that they went to the Barnegat Company. Those notes were not paid. The plaintiff having told

him in January, 1891, that the notes Ladenburg, Thallman & Co. held were good notes, all made by army officers, Schramme endeavored to find the makers by writing to them at the addresses written by plaintiff on the notes, but could find out nothing. Schramme testifies that he told the plaintiff he suspected the notes were bogus, and that the latter, after first reiterating that there was a mistake and that the notes were all army officers' notes and would be made all right, confessed that he had manufactured the notes under orders from Adams and Simmons.

The notes discounted by Kaufman Simon for the Barnegat Company were presented, as Simon testifies, in every instance by Conkling. Simon claims that the company was indebted to him on notes and checks in the sum of $15,000. Plaintiff and Conkling admit an indebtedness of the company to Simon of $11,000.

As a result of the discounting business, Adams failing to contribute any money, and a note of his to the company having gone to protest, the finances of the company got in a very bad way, and sales of property had ceased. It was proposed by Adams, the president, to raise money by bonding the company. Conkling testifies that Adams and James A. Simmons, Adams' friend, proposed a $500,000 trust mortgage, with the Holland Trust Company as trustee, and that they brought in Mr. Edward H. Murphy, a New Jersey lawyer, to draw it up. Van Siclen says he was first spoken to about the $500,000 mortgage in September, 1890. However, before the trust mortgage scheme was accomplished, $35,000 was borrowed from the Holland Trust Company, secured by a mortgage dated October 23, 1890, and recorded October thirtieth, due one day from date. Plaintiff says the two mortgages were talked of rather at the same time, the $35,000 mortgage being represented as a mere temporary expedient until the bonding arrangement could be effected, that being a matter which required a little more preparation, and that he *inferred* the $35,000 mortgage was not to go on record. Conkling testifies that the negotiations were conducted entirely by Murphy and plaintiff, but he is positive not only that the $500,000 mortgage was first talked of, but that it was drawn and executed and delivered to Murphy to be recorded before the other, and that when the $35,000 mortgage was recorded he supposed the trust mortgage had already been recorded.

These statements of plaintiff and Conkling are flatly contradicted by the terms of an agreement dated December 18, 1890, to which they were parties and which bears their signatures, which recites that the $35,000 mortgage " is the first mortgage on the property of the company, and the same is duly recorded; " and the first stipulation of said agreement is that the $500,000 trust mortgage shall be placed of record. The inconsistency between their statements as to the order in which the mortgages were to be recorded and this evidence furnished by the written agreement is nowhere satisfactorily explained, thus leaving the record in that condition that the conclusion is forced upon us that both Farrow and Conkling knew, or were in a position to have known, before they made the statements, that their evidence was false.

Conkling also testifies that after the bonding plan was agreed upon, Murphy and Simmons suggested that, as it was necessary to raise money immediately, and as the Holland Trust Company was one of the largest creditors of the Park Company, in order to protect itself, it should be induced or forced to advance $35,000 on mortgage to pay off the pressing creditors and avoid disaster; that he and plaintiff agreed to it; that Van Siclen refused to advance the $35,000, or to allow his company to do so, but an arrangement was made for the trust company to advance $10,000, which was done, and a chattel mortgage given on the hotel for $10,000; that a few days later, not satisfied with $10,000, these men forced the trust company to make it $35,000, and the mortgage was executed. Van Siclen's testimony on this subject is, that the Holland Trust Company first advanced $10,000, and afterwards the amount was increased to $35,000, to pay off lienors on the hotel; that the Barnegat Park Company's note was taken for $35,000, and a mortgage on the real estate furnished for $35,000 as security for the note, and a chattel mortgage for $10,000 on the furniture, also given as joint collateral.

In connection with this $35,000 mortgage a statement of the condition of the company was drawn up, signed by Adams and Conkling, and submitted to the Holland Trust Company. It represented that there were no mortgages of any description on the property of the Barnegat Company; that the hotel property cost about $87,000; that the total amount of bills against the hotel was about $5,000,

and against the furniture about $14,000, " for which the maker holds the company's notes which are paid at maturity whenever due;" that this statement is made for the purpose of obtaining from the trust company an immediate loan of $10,000. The statement concludes as follows:

" We would add that the hotel property and furniture is insured for $70,000, the policy for which will also be handed over to you, it being resolved by the company to make you its trustee in the matter of a mortgage bond issue of $500,000 *to be arranged for.* It is further understood that any moneys advanced by you are to be paid, if not sooner, from the first sales of the bonds which are to accompany said mortgage as per previous arrangements."

From this documentary evidence it would appear that the $500,000 trust mortgage was a transaction arranged subsequently to the $35,000, contradicting Conkling's oral evidence on this point, and confirming defendant's contention that the $35,000 was understood to be a prior lien, created to meet immediate necessities, and to be paid off out of the proceeds of the first sales of bonds under the $500,000 trust mortgage.

The trust mortgage for $500,000 was drawn, dated November 1, 1890, with the Holland Trust Company as trustee, with the object of issuing bonds thereunder, from the proceeds of sale of which the creditors of the company should be paid and the company set on a sound footing.

Before the trust mortgage was recorded, however, and on December 20, 1890, a directors' meeting of the Barnegat Park Company was held, at which were present Adams, Farrow and Conkling. By virtue of a resolution passed at said meeting, mortgages were prepared by Murphy, as attorney for the Barnegat Company, one to plaintiff for $32,000, one to Kaufman Simon for $15,000, one to the New York Improvement Company for $33,000, and a trust mortgage, with Conkling as trustee, in favor of certain creditors, to wit:

| | |
|---|---:|
| Ladenburg, Thallman & Co | $21,000 |
| Southern National Bank | 8,000 |
| Holland Trust Company | 40,000 |
| E. S. Farrow | 45,000 |
| Aaron Raymond | 6,000 |

| | |
|---|---|
| People's Trust Company | $6,000 |
| R. I. Harrison | 4,000 |
| Edward Wetmore | 5,000 |
| E. W. Lancaster | 1,000 |
| G. W. Van Siclen | 5,000 |
| Lord & Taylor | 6,000 |
| | $147,000 |

A declaration of no set-off against the Simon mortgage, certifying that it was "a good, valid and existing lien, and based on a full and proper consideration, and the Barnegat Park Company had no defense thereto either in law or equity," was made by the Barnegat Park Company, signed by Adams as president and Farrow as treasurer, and Farrow acknowledged his signature thereto on the witness stand.

These five mortgages are all dated December 16, 1890, and were recorded December twentieth, at twelve M. The first four mentioned state that they are concurrent liens, and are in all respects to pro rate with each other upon the lands of the company, due one day from date. By the terms of the resolution authorizing their creation, the said mortgages were to come equally as to priority immediately after the first mortgage of $35,000 already held by the Holland Trust Company.

The $500,000 trust mortgage was recorded at seven-thirty P. M., December twentieth, seven and a half hours after the five mortgages above mentioned.

The mortgage to the New York Improvement Company was assigned by that company to Murphy as security for money loaned by him to Simmons. The laborers employed by the improvement company at the park being unpaid, and rioting for their money, the Holland Trust Company advanced $3,500 to pay the laborers on account, and took the mortgage as security for such advance.

By agreement made December 18, 1890, between the Barnegat Company, Van Siclen as trustee, and the mortgagees named in the five mortgages above mentioned, it was agreed that the Barnegat Company should record the $500,000 trust mortgage; that stock equal to the indebtedness of the company to each of the creditors should be issued to them; that said five mortgages, after being

recorded, should be assigned to said trustee, together with satisfaction pieces executed on the condition that said mortgages should be canceled and satisfied of record on payment to the mortgagees named or assigns, as their interest might appear, and that the stock should be delivered to and held by the trustee until the provisions of this agreement were performed; that the company should deliver to said trustee sufficient stock to enable him to hold a majority of the stock of the company; that the Holland Trust Company should be fiscal agent and hold all bonds for sale at eighty, and get a commission of five per cent on sales of bonds made by it or through its agents. It was further agreed that the proceeds of said bonds should be applied, after providing for the ordinary expenses of the company, to the payment of the company's mortgage indebtedness; further, that the trustee should receive as compensation $25,000 in cash, to be retained from proceeds of sales of bonds, and a like amount of bonds, independent of any sum paid to the Holland Trust Company for its services connected therewith. This agreement was signed by plaintiff, Van Siclen, Conkling, individually and as trustee, the New York Improvement Company, Simon and the Holland Trust Company.

Van Siclen testifies that it had been his intention to have the $500,000 mortgage made a prior lien to the concurrent mortgages, but that Murphy having, in the interests of his clients, recorded the concurrent mortgages ahead of it, he made other arrangements when he was confronted with this condition; that he learned from Murphy that those five mortgages had been executed ahead of the $500,000 trust mortgage, and when he heard of it he sent for plaintiff and told him he must secure the Holland Trust Company for the advances made to him and the park company by assigning his mortgage to the Holland Trust Company as collateral, which plaintiff agreed to, and also agreed to assign the Farrow and Conkling mortgage, which he owned, as additional collateral. These assignments, dated December 20, 1890, were put in evidence by plaintiff. They were not acknowledged until February 16, 1891. Plaintiff gives a different version, and says he did not know in what order the mortgages were recorded until some time afterwards, but that his assignment of the mortgages was made about the time of their execution, with satisfaction pieces in pursuance of the agreement above referred to

of December eighteenth, and that in January, 1891, another assignment was demanded, which was given, and dated back to the original date in December.

On December 20, 1890, Adams, by request, resigned as president of the company; the plaintiff at the same time resigned as treasurer, retaining the office of secretary. R. B. Roosevelt, Jr., succeeded as president and defendant Schramme as treasurer; and on January 7, 1891, Roosevelt, Jr., Farrow, Conkling and James L. Phelps, the latter a clerk in plaintiff's employ, were elected directors.

Simon, in accordance with the agreement of December 18th, executed a satisfaction piece of his mortgage and delivered it to Van Siclen as trustee, receiving from the trustee a receipt therefor, with the condition inserted in the receipt that if the mortgage was not paid within a reasonable time the satisfaction piece should be returned to him. Simon testifies that when his mortgage was given to him he was told that there were three or four other mortgages, and that on his suggestion it was agreed between himself, Conkling, Farrow, Murphy and Simmons, that his (Simon's) mortgage, should be a second lien and the other concurrent mortgages third, the $35,000 being a first lien; that then, his mortgage being second, he proposed to the Holland Trust Company either to buy the $35,000 mortgage from them or that they buy his $15,000 mortgage, and that several weeks after the tender they agreed to take his mortgage, and paid him $15,000 for it. For some reason it was objectionable to plaintiff that Simon should buy the $35,000 mortgage, for, on January 1, 1891, he wrote to Van Siclen as follows: "Look out for Simon; he wants to pay you the $35,000; he now has the money on hand to do it, and he will do his best to get control."

January 24, 1891, plaintiff wrote to Van Siclen as follows:

"If Messrs. Roosevelt and Schramme will contribute $12,500 each at once to the treasury of B. P. Co., give them each $25,000 of the first mortgage bonds of the company, also $15,000 Simon bonds. A resolution to this effect will at once be passed. As soon as this $25,000 is paid in the B. P. Co. pay off the Simon mortgage, $15,000, pay Edward D. Murphy $5,000, and expend the remaining $5,000 for pressing company bills. When the Simon $15,000 is paid off return to Farrow & Conkling the $11,700 belonging to Farrow & Conkling, now held by Simon as collateral, also recover

"for B. P. Co. $2,600 worth of diamonds likewise held by Mr. Simon as collateral."

Plaintiff says he was coerced by Van Siclen to write this letter; that he wrote it at Van Siclen's dictation in the office of the Holland Trust Company.

The $25,000 was advanced by the Holland Trust Company and Ladenburg, Thalhnan & Co., and the money expended as indicated in the letter.

January 7, 1891, the Barnegat Park Company adopted, at a directors' meeting, a resolution that, in order to fulfill a former agreement, this company at once pay to Mr. George W. Van Siclen $25,000 in first mortgage bonds of the Barnegat Park Company, and $25,000 in cash; and as at the present time there is not sufficient cash in the treasury to pay said amount, to give him $50,000 in first mortgage bonds of the Barnegat Park Company as collateral to secure said payment of $25,000 in cash.

By agreement dated January 17, 1891, the agreement of the 18th of December, 1890, wherein Van Siclen as trustee was recited as party of the second part, and certain creditors as party of the third part, was rescinded by the creditors in said agreement named, and January 20, 1891, at a directors' meeting of the Barnegat Park Company, a resolution offered by Conkling, and seconded by the plaintiff was unanimously passed that said agreement, so far as Barnegat Park Company was concerned, was rescinded and annulled, upon Mr. Van Siclen assenting thereto.

In and by virtue of the same resolution, the Barnegat Park Company was empowered to execute an agreement wherein the company was named as the party of the first part, and Van Siclen and Schramme as the party of the second part, and said agreement was accordingly entered into; by which it was agreed by said company, in order, if possible, to avoid the necessity for foreclosure of the existing mortgages against the company, that there should be created two descriptions of bonds, to wit, first mortgage bonds to the amount of $300,000, and (2) income bonds to the amount of $200,000, for both of which classes of bonds the Holland Trust Company was to be trustee, said bonds to be sold at a price thereafter to be agreed upon, and five per cent to be paid or allowed Van Siclen and Schramme therefor; and Van Siclen and Schramme

agreed to advance the following sums on the following terms and conditions :

(1) Fifteen thousand dollars to procure an assignment of the Simon mortgage, together with all his collateral therefor.

(2) Five thousand dollars to be paid to Murphy and to procure an assignment of his claim therefor, together with all collateral security held by him.

(3) Five thousand dollars to be advanced to the company for the purpose of carrying on its future business, out of which sum $1,000, said to have been heretofore advanced by Van Siclen for account of the company, was to be paid him.

It was further agreed that $50,000 of the first mortgage bonds shall be forthwith delivered by the Holland Trust Company to Van Siclen and Schramme in compensation for their services in the matter of this agreement; that $5,000 of first mortgage bonds be delivered to Van Siclen as in payment of services by him hitherto rendered to the Barnegat Company, and that $15,000 of said bonds be delivered to the party of the second part to pay for the $5,000 furnished by them under this agreement for carrying on the future business of the company ; further, that Van Siclen be paid $5,000 of the income bonds as a balance of compensation due for services in full to date of this agreement; and that as compensation for the joint benefit of the persons composing the party of the second part they receive $65,000 of said income bonds for all services to be rendered by them in carrying out the objects of this contract.

Although the parties differ as to whether what are described as the concurrent mortgages were to be placed on record prior to the $500,000 mortgage or subsequently thereto, it is evident that, with knowledge of all the facts as to the actual order in which they were recorded, this agreement of January 17, 1891, was entered into. An attempt to carry out its terms was made, and the failure resulting hastened the collapse of the company. Each one was left to protect his particular interests in the best way that he could, and the first step seemingly taken was that of January 23, 1891, in a suit brought by Schramme and Van Siclen to foreclose the $32,000 mortgage which, according to its terms, had been assigned by plaintiff as collateral security for his indebtedness. Subsequently creditors' meetings were held, a report of the condition of the company

presented, and an effort made to induce the creditors and those holding mechanics' liens on the property to extend the time of payment and to take notes secured by first mortgage bonds as collateral. This effort was likewise abortive, and again the affairs of the company were thrown into inextricable confusion.

The causes of this last failure to effect a settlement with creditors are said to have been not only the existence of prior purchase-money mortgages amounting to about $6,000, which antedated the first mortgage of $35,000 given to the Holland Trust Company, but the inability of the company to prove title to more than about 6,000 acres of land, and the unwillingness of those holding mechanics' liens to cancel the same. It is unnecessary for us to determine the cause, the result being that a settlement was not effected, and then followed a series of litigations by the Holland Trust Company and by Van Siclen and Schramme against the Barnegat Company and the plaintiff, as well as this action by the plaintiff, which was brought in July, 1891, directed principally against the Holland Trust Company, Schramme, Murphy and Van Siclen, charging a conspiracy on their part to wreck the Barnegat Company and defraud it, and to deprive the plaintiff and other creditors of their property by trick and device, by resorting to various means to obtain the property of the Barnegat Company free and clear of all mortgages and judgments.

The learned trial judge concluded that these charges were in the main sustained; that the various transactions in which the defendants took part were in furtherance of a scheme or conspiracy to defraud the plaintiff and the other creditors of the Barnegat Company, and decided that all the mortgages, stocks, securities, vouchers and papers assigned to any of the defendants should be retransferred to plaintiff, except one mortgage to the Holland Trust Company for $35,000, and the others canceled as void; and fearing that sufficient justice would not thus be done to plaintiff, by a finding which was not, however, included in the judgment, declared that the plaintiff had been damaged by the defendants to the extent of $150,000.

In all this the learned judge seems to have lost sight of the very prominent part which the plaintiff took in every transaction, excepting the actual placing by Adams and Simmons of some of the spurious notes with the trust company, proven to have been fraudulent. He it was who cunningly laid the plan by which, working

upon the cupidity of Van Siclen, he induced him to forget the duty which he owed to the trust company of which he was an officer, and to advance its moneys upon false securities. The result is that the trust company now holds worthless notes to the amount of about $46,000, which it purchased from the park company, some with and some without plaintiff's indorsement. The makers of such notes were either myths or totally irresponsible persons; and these were secured by pretended vendors' liens, which were fictitious and sham. In this way the trust company, by Farrow and those who can be justly regarded as his accomplices, has been swindled out of that amount of money.

In this condition of the record, we are unable to conceive how any relief could be accorded to one standing in the position of this plaintiff, coming as he has done into a court of equity, his hands soiled with his fraudulent acts, resulting in injury to third parties. It has ever been a salutary principle of courts of equity that suitors must come therein with clean hands; and the application of this principle to the facts here appearing should have impelled the trial judge to turn the plaintiff out of court. As shown, from the very formation of the Barnegat Company down to the time that it passed into the receiver's hands, its affairs were dishonestly conducted by Farrow and Conkling and those whom they associated with them in the control of the company. And that this is true is shown by the plaintiff's own answers to the questions put to him with respect to the very beginning of the company's operations, wherein he admits that the sales and notes given, even in those early days, were not always *bona fide.* When it was impossible to sell lots, and there were no notes to dispose of, this in no way prevented those in charge of the company from getting clerks and laborers in their employ, and men working at the life-saving stations, to sign such notes, which were sold under representations that they were the notes of army officers given in part payment for lots purchased. These to the amount of $100,000 at least were sold, and banks and financial houses, as well as the Holland Trust Company, were thus victimized. It is true that plaintiff insists that it was Simmons and Adams who put such paper upon the market, and he claims that it was stolen from the office of the Barnegat Park Company; but he does not deny that he knew of the existence of such paper, and no explana-

tion is offered why there should be such paper in existence in the office of the company, whence it could be stolen and passed off upon innocent purchasers. But in addition in this record will be found a list of the names and makers of some of the bogus notes that the park company used to get money from the trust company furnished by Farrow himself. And so with respect to the mortgages which are now assailed. Those were devised and arranged for as another means of raising money when the sale of spurious notes was no longer possible.

The participation of Van Siclen, who was an officer of the trust company, did not deprive the latter of the right to attempt to recover by all legal means the moneys out of which it had been unlawfully and wrongfully swindled. And yet it was upon the evidence adduced by the plaintiff, who was a party and privy to the injury inflicted upon the trust company, that a finding was made which, in effect, held the trust company chargeable with fraud and powerless to hold or enforce the meagre securities in its possession other than the $35,000 mortgage.

If, however, we were to assume that the plaintiff ought not to be turned out of court, but had the right to present his grievances and those of the company to a court of equity, there are many other serious objections to the judgment entered. The complaint sets forth two separate and distinct causes of action — one for grievances of the plaintiff individually, and another for injuries inflicted upon the Barnegat Company. The judgment decrees relief upon both causes of action. The cause of action in favor of plaintiff was predicated upon the theory that by false representations he was induced to assign, without consideration, two mortgages, together with certain certificates of stock of and claims against the Barnegat Company to certain of the defendants.

One of these mortgages, namely, the one for $32,000, which it is stated was assigned as collateral security only, it is alleged in the complaint has been since assigned to another by the plaintiff, subject to the said assignment as collateral. With respect to this mortgage, we fail to see by what right the plaintiff can bring an action and obtain a judgment directing that the same should be reassigned to him.

So as to the second cause of action, with respect to injuries inflicted upon the Barnegat Park Company. In the absence of proper allegations excusing the failure of the Barnegat Company to bring a suit on its own behalf, the plaintiff is in no position to sue or obtain a judgment on behalf of such company. The complaint and the proof are entirely barren of any facts showing that the company has been requested to bring such a suit, or that the situation of the company with respect to its control is such that the plaintiff as a stockholder-is entitled to maintain such an action on its behalf. It will be noticed, moreover, that the plaintiff does not claim to sue on behalf of the company, and yet he is permitted on its behalf to have judgment nullifying and declaring void its corporate acts.

The sweeping character of the judgment is further evidenced when we consider its bearing upon the Simon mortgage for $15,000, which was transferred to the Holland Trust Company. The latter, it is conceded, paid in the plaintiff's presence and at his request, and on the faith of a certificate signed by him that it was a valid and subsisting security, the full amount therefor. And yet in this action the plaintiff is awarded, on behalf of the corporation, a judgment decreeing that this mortgage is void.

We think, too, that whatever reflections may be made upon the defendant Van Siclen, whose conduct throughout was most reprehensible, this should not unjustly bear upon the trust company, which ought not to be held responsible for all his acts and thus be deprived of the security it received for money advanced. That in some of his acts he represented and bound the trust company is clear, but regard being had to his individual relation to some of the transactions, we think the court erred in holding that he acted as an officer and agent of the trust company in all the transactions of which the plaintiff complains.

It will be seen that we are also unable to agree with the judge below in his opinion that the record fails to disclose any action or representation of the plaintiff calling for condemnation by the court. Far from regarding him blameless, we think his plan for raising the money necessary for " the development of his ideas " by procuring the discount of worthless notes pretended to be given in part payment for lots, was a canker which so gnawed the roots

of the enterprise that disaster was inevitable and might have been reckoned with upon the inception of such methods.

In addition there are many errors in the findings, some of which only it will be necessary to point out. Although the evidence was uncontradicted, the court refused to find that there were prior mortgages covering parcels of the land, which were created prior to the ownership of the Barnegat Company. And in the finding that the notes on which the Barnegat Park Company obtained money from the trust company are usurious, the error is apparent when we recall the rule of law that, no matter what the discount, usury cannot grow out of buying paper from a corporation, even where the paper is made for the corporation's accommodation.

It is unnecessary for us to discuss the numerous findings and conclusions, because we regard one salient feature which pervades the whole record, and which has already been alluded to, as fatal to the interlocutory judgment. This consists of the effort to try two separate and distinct causes of action, one in favor of plaintiff and one in favor of the Barnegat Park Company, in a suit brought by this plaintiff, and in such an action not only to accord to the plaintiff such relief as he might, upon the evidence, have been entitled to, but also in effect to destroy all the corporate acts of the corporation and adjudicate as to the amounts and priorities of claims against it, which by the interlocutory judgment are directed to be tried before a referee.

The Barnegat Park Company is a New Jersey corporation, now in the hands of a receiver appointed by the Court of Chancery of that State. It is not claimed that it has any assets in this State, its property consisting exclusively of lands in New Jersey. Yet by the judgment, in the absence of the receiver as a party to the action, and at the suit of a plaintiff who has no right to maintain such an action on the company's behalf, the court assumes such right, without declaring the corporation insolvent, and requires creditors to prove their claims before a referee, under the penalty of having all claims adjudged void that are not so proven.

Our conclusion, therefore, is that this judgment should not be permitted to stand, but in all respects should be reversed and a new trial ordered, with costs to appellants to abide event.

FOLLETT, J., concurred.

VAN BRUNT, P. J.:

I concur in the conclusion reached by Mr. Justice O'BRIEN.

It is difficult to see upon what basis the learned court below arrived at the judgment which was entered in this action.

It appears from the evidence that very early in the history of this enterprise the plaintiff began the manufacture of fraudulent securities, because as far back as March, 1890, and shortly before the plaintiff opened his individual account with the defendant, the Holland Trust Company, we find that fictitious notes were issued stating over the plaintiff's own signature that a large part of the purchase price of certain lots had been paid by the makers of the notes, who, the plaintiff testified, had simply gone through the ceremony of buying the lots without paying a cent.

It further appears that the plaintiff made and negotiated (for although he denies the latter fact, yet it is proved beyond peradventure) notes made by the employees and laborers of the Barnegat Company, which notes were represented to be the notes of the purchasers of lots who had paid part of the purchase price, and that the company held vendors' deeds as security for the notes. This is the class of securities which the cupidity of the Holland Trust Company and its secretary induced them to take without making the slightest investigation in regard to their validity, the whole course of business being of a character which savored rather of the methods of reckless speculation than of those which are supposed to belong to a so-called trust company.

We find further, upon an examination of this record, that the testimony of the plaintiff, standing by itself, is totally unworthy of credit, because in so many instances it is contradicted by the documentary evidence introduced upon the trial. Instead of the plaintiff and the Barnegat Company being robbed through a conspiracy, it would seem that the Holland Trust Company and others were swindled to a large extent by means of these fraudulent securities. And when they attempt to recover by some means the money which they had advanced upon the fraudulent and false representations of this plaintiff, it is held in this action to have been part of a conspiracy to rob the Barnegat Company and to deprive the plaintiff and their creditors of their property by trick and device.

It cannot be doubted that the Holland Trust Company had the

right to attempt to enforce the securities given to it for a portion of the money which it advanced, since the money had been advanced in the vain hope of saving that which they had already hazarded in the enterprise. This certainly proved no conspiracy on their part to rob the Barnegat Company. It should rather be charged against the plaintiff and his co-laborers who manufactured these fraudulent securities, and induced divers persons to take them. It seems that the fraud initiated by the plaintiff and his associates was the source of all the unbusinesslike transactions with which this enterprise seems to bristle.

The claim upon the part of the plaintiff, that the Holland Trust Company was guilty of bad faith in recording the mortgage of $35,000, seems to be entirely refuted by the agreement signed by the plaintiff and Conkling in respect to the trust mortgage, where it is expressly recited that the $35,000 mortgage is the first mortgage on the property of the company and the same *is* duly recorded. At this time the trust mortgage had not been executed, and yet the recording of this mortgage is one of the frauds of the Holland Trust Company by which it was seeking to rob the Barnegat Company, recording an instrument given for money which it had advanced, and then endeavoring to collect the money.

But it is useless to multiply instances. Whatever fraud the record discloses, it also shows that the plaintiff was a little deeper in it than anybody else connected with this action. For such a person to call upon a court of equity to restrain one of his victims from attempting to retrieve itself is a spectacle which has not been exhibited, to my knowledge, in a court of justice before.

It is clear that the plaintiff has no right to the intervention of a court of equity, and the judgment should be reversed, and a new trial ordered, with cost to appellants to abide event.

FOLLETT, J., concurred.

Judgment reversed and new trial ordered, with costs to appellants to abide the event.