## PRIMEAU v. GRANFIELD.

(Circuit Court of Appeals, Second Circuit.    January 31, 1911.)

### No. 106.

1. EQUITY (§ 65*)—MAXIMS—CLEAN HANDS.

It is a fundamental principle of equity jurisprudence that a court of equity will exercise its powers only to enforce the requirements of conscience, and that he that cometh into equity must have clean hands.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 185–187; Dec. Dig. § 65.*

He who comes into equity must come with clean hands, see note to Knapp v. S. Jarvis Adams Co., 70 C. C. A. 543.]

2. APPEAL AND ERROR (§ 169*)—REVIEW—REVERSAL—GROUNDS—PUBLIC POLICY—QUESTIONS NOT RAISED AT TRIAL.

Where, in a suit in equity to enforce an alleged trust and for an accounting, it appeared to the Court of Appeals that the parties had knowingly engaged in a fraudulent joint enterprise for the sale of fraudulent mining stock to the public, and that to decree an accounting would require an investigation of continuous fraudulent transactions and an ascertainment of the profits derived therefrom, the appellate court would reverse a decree for complainant and direct a dismissal of the bill on its own motion on the ground of public policy, irrespective of the fact that such question was not raised by the pleadings nor urged by either party in the trial court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1018–1034; Dec. Dig. § 169.*]

3. EQUITY (§ 65*)—MAXIMS—FRAUDULENT JOINT ENTERPRISE.

In a suit to declare a trust and for an accounting, evidence *held* to require a finding that complainant and defendant were engaged in a fraudulent joint enterprise for the sale of fraudulent mining stock to the public, and that the granting of relief to complainant would involve an investigation of various connected fraudulent transactions in furtherance of the scheme, requiring a dismissal of the bill on the theory that complainant did not come into equity with clean hands.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 65.*]

Appeals from the Circuit Court of the United States for the Southern District of New York.

Suit in equity by Paul A. Primeau against Horace Granfield, continued after his death by Olive L. Granfield, his executrix. Decree for complainant, and both parties appeal. Reversed and remanded, with instructions.

See, also, 184 Fed. 480.

The plaintiff sued the defendant[1] charging, in substance, that he, living in the East, had remitted from time to time to the defendant in Colorado for investment in mining shares and properties, different sums of money; that the remittances were made under circumstances which created a fiduciary relationship between the parties; that the defendant deceived the plaintiff as to the value of the investments and made false representations as to the prices paid for different properties and shares; that the defendant held in trust for the plaintiff the moneys which he had remitted less the sums properly expended in his behalf, and that he was entitled to follow such moneys into certain mining properties.

---

[1] Horace Granfield, the original defendant, died after the rendition of the decree appealed from and his executrix has entered to defend. In the statement and opinion following, however, the parties are designated as if no change had taken place.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The different prayers for relief in the bill were an injunction, a disclosure, a following and charging of certain properties as constituting trust funds, and an accounting. The prayer for an accounting was the principal prayer and was broad in its scope asking, in substance, that the defendant be required to account with respect to all the transactions between the parties.

The answer of the defendant amounted substantially to a denial of the allegations of the bill, and the theory of the defense presented upon the trial seems to have been that the parties stood in the position of vendor and vendee; that there was no fiduciary relationship between them and no ground for the following of funds; that the defendant at all times dealt honestly with the plaintiff, and that there was no basis for an accounting.

The Circuit Court found that a fiduciary relationship was established with respect to a large number of transactions; that certain investments should be followed as trust funds, and that an accounting should be had before a master. The accounts having been taken, the court decreed that the plaintiff should recover from the defendant the sum of $293,915.09.

Both parties have appealed from the decree, the appeal of the plaintiff being confined to certain alleged errors in the accounting.

Upon this appeal the following contention is for the first time made in behalf of the defendant:

"The complainant and deceased defendant were jointly engaged as principals in carrying out a scheme to defraud innocent investors and the fact that one of them may at times have acted in subordination to the other does not render him less a principal; neither of them is entitled to an accounting in a court of equity in respect to the transactions which were the subject-matter of their joint fraudulent enterprise."

Clarence J. Shearn (Frank I. Tierney and Mark Hyman, of counsel), for complainant.

Choate & Larocque (Clarence B. Mitchell, William H. Davis, and Joseph Larocque, of counsel), for defendant.

Before LACOMBE, COXE and NOYES, Circuit Judges.

NOYES, Circuit Judge (after stating the facts as above). [1] It is a fundamental principle of equity jurisprudence that a court of equity will exercise its extraordinary powers only for the enforcement of the requirements of conscience, and in enforcing them it demands conscientiousness in the parties. He that cometh into equity must have clean hands. He that hath committed iniquity shall not have equity. He that hath engaged in a fraudulent enterprise cannot complain that his associate in fraud has not kept the faith.

Interwoven with these elementary equitable principles are those considerations of public policy which require the fostering of common honesty. A court of justice does not sit for the promotion of fraud or illegality. It is no part of its function to aid any party to a fraudulent or illegal scheme in carrying it out; in adjusting its accounts, or in dividing its spoils. It will take the parties to such a scheme as it finds them, and as it finds them will leave them without assistance in their fraudulent enterprise. These principles are not new. Indeed they were old in 1725 when John Everet filed a bill against his partner for an accounting of dealings with good success at Hounslow Heath, "but when it appeared that the trade was taking the purses of those who traveled over the heath, the court would not endure the bill." 9 Law Quar. Rev. 105, 197.

The defendant now contends—as already indicated—that this is a cause which comes within these principles and that the bill should be dismissed because the parties were jointly engaged in a fraudulent undertaking and the suit is, in effect, one to take an accounting of an illegal conspiracy.

The reply of the plaintiff to this contention is, in the first place, that we have no right to consider it because it is not stated in the pleadings and is inconsistent with the theory upon which the defendant presented his case in the court below.

While the trial judge considered the question of corrupt conspiracy, it would seem that he did so of his own initiative. No such charge appears in the answer and it is evident that no such contention was made upon the trial. Granfield was then alive and while his counsel were quite willing to urge that Primeau's hands were not clean, they were apparently chary of insisting that their own client was in a worse condition. But showing that Primeau dealt wrongfully with his customers related to only one phase of the alleged fraudulent enterprise, and does not amount to the contention now put forward after the death of Granfield. Now there is less reluctance that his reputation should be assailed than that his estate should be diminished. His representatives urge that the decree should be set aside because he was an active participant in a scheme to defraud. If the question were merely one of pleading, we could view with equanimity the existence of a decree against Granfield.

[2] But from the very nature of the fundamental principles involved it is manifest that the question is deeper than one of pleading. The court must consider it not because it is a matter of defense to the defendant but because it is against public policy to hear the case if the charge be established. The court acts for its own protection rather than for the protection of the defendant. When fraud or illegality is disclosed in a case, public policy requires a court to refuse its aid irrespective of the state of the pleadings and regardless of the fact that with fraud and illegality absent the plaintiff might appear entitled to relief. McMullen v. Hoffman, 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117; Memphis Keely Inst. v. Leslie E. Keeley Co., 155 Fed. 964, 84 C. C. A. 112, 16 L. R. A. (N. S.) 921; Teoli v. Nardolillo, 23 R. I. 87, 49 Atl. 489; Drake v. Lauer, 93 App. Div. 86, 86 N. Y. Supp. 986.

[3] It is our duty then to examine into the charge of fraudulent conspiracy notwithstanding that it is not set up in the pleadings, and if we find it established we shall be constrained to shut the door of the court against the plaintiff in limine without passing upon the merits of his demand for an accounting.

A fraudulent scheme or conspiracy to defeat the suit must be shown, if at all, by the establishment of three propositions:

(1) That the parties were engaged in a joint enterprise.

(2) That the joint enterprise was fraudulent.

(3) That the fraudulent joint enterprise is directly involved in the suit.

193 F.—58

The proof establishes clearly that Primeau and Granfield were associated in the business of selling mining shares. They had common interests and acted together. Granfield obtained the stocks in Colorado and sent them to Primeau to be sold in the East. This is shown by the testimony of both parties who stated that their interests were common and that Granfield was to assist Primeau in selling the stocks by writing letters and in other ways.

Co-operation and common interest are shown by other facts and circumstances. Thus Granfield, as agreed, did write letters to assist Primeau in marketing shares. Granfield paid for advertising to attract customers to Primeau. The Hawkeye corporation was organized through their concerted action. Primeau informed Granfield of the progress of the business and of cases of threatened trouble and Granfield repeatedly advised him. So Primeau wrote Granfield that he fully appreciated his "work at the other end of the game," and Granfield wrote Primeau that he had a "hard job managing things at this end of the line."

The arrangement between the parties did not, apparently, contemplate a division of the profits which Primeau should obtain from the sales to his customers. Granfield claimed that he made his profit by selling his own shares to Primeau at profitable prices. If this were true, still we think the necessary co-operation and concert of action between the parties made them associates in a common enterprise. And if the plaintiff's contention be correct that Granfield acted as his agent and bought these mining claims and shares upon commission, it is even more clear that the parties were associated in a joint undertaking in which the more shares Primeau could sell and the more shares Granfield could assist him in selling, the greater the reward of both. The fact that Granfield as agent of Primeau may have been acting in a subordinate capacity and may have received but small profit or even no profit at all does not make him any less a principal if the enterprise were an unlawful one. As said by the New York Court of Appeals in Leonard v. Poole, 114 N. Y. 371, 378, 21 N. E. 707, 709 (4 L. R. A. 728, 11 Am. St. Rep. 667):

"When persons knowingly promote and participate in carrying out a criminal scheme they are all principals, and the fact that one of the parties acts, in some respects, in subordination to the others, and is to profit less than the others, or not at all, by the consummation of the scheme, does not render such person less a principal."

Reaching, as we must, the conclusion that the parties were engaged in a joint enterprise, the next inquiry is whether this joint enterprise was a fraudulent one. In determining this question we must not expect to find a formal fraudulent agreement. Parties about to engage in fraudulent enterprises are not likely to set down their purposes in writing. We must consider the relations of the parties and all the facts and circumstances to ascertain the real nature of the joint enterprise.

Among the facts and circumstances indicating the character of the enterprise are these:

(1) Primeau, with Granfield's assistance and often by means of decoy letters written by him, made false statements and representations to his customers concerning the cost and value of shares sold.

(2) He also made false representations that personal stock sold was treasury stock.

(3) Both parties assisted in manipulating the market for stocks by fictitious bids, giving of shares to obtain influence, and in other ways.

(4) They defrauded the Government in connection with the organization of the Hawkeye corporation and falsely dated the papers.

(5) They sold to ignorant persons at unconscionable prices.

(6) They assisted each other in misleading investigators sent to Colorado to examine the mining claims.

It is unnecessary to examine into the facts in detail. It is sufficient to say that the testimony shown upon this record convinces us beyond a doubt that these parties were engaged in a fraudulent scheme to sell worthless mining shares to innocent investors. That the stocks and claims which they dealt in were practically worthless is demonstrated as a part of the plaintiff's own case. That Granfield well knew their worthless character is also most manifest. And we are convinced, taking the testimony as a whole, that Primeau too well knew the true nature of these shares and was more than willing to co-operate with Granfield in the fraudulent scheme to dispose of them to ignorant people at high prices.

It must be remembered that these men dealt principally through correspondence and no one can examine their letters without being absolutely convinced of the full knowledge and participation of both of them in the fraudulent enterprise. Thus we find in the letters a request for a "nice" letter, and a decoy letter sent in reply; admissions of false representations made to customers, false statements known to be such by both parties accompanied by the words, "See?" or "So you understand it"; requests for letters with false dates; statements that stocks transferred had been dated back; statements that unless something is done "our names will be mud"; statements of Granfield that "I must square this thing up" and "I will go to Denver as soon as I get the money to patch things up for fair," and of Primeau to "trust me to put them to sleep in Montreal"; directions from Granfield to Primeau stating that he had written to certain prospective customers and to "Go and get their money"; accounts of the "Committee" which went out to examine one of the mines, and which Granfield, at Primeau's request, guaranteed "to fill up" and the effect of whose filling up Primeau believed would be to "kill off all the suckers everywhere."

The contention of the plaintiff that he did not draw out his moneys from the enterprise but for many years turned over the proceeds of his sales to Granfield for new purchases, is entitled to consideration as indicating his good faith and his belief in Colorado mining properties. We have, in considering the case, given due weight to Primeau's lack of education, and have endeavored to ascertain whether his participation in the enterprise could be attributed to faith in Granfield and belief in the properties. But as already stated we have been com-

pelled to the conclusion that he well knew the nature of the shares dealt in, and participated most actively in the fraud. We can only conclude that he became so enthusiastic over his profits from the fraudulent sales that he preferred to adopt the process of "pyramiding" rather than that of drawing out.

For these reasons we are obliged to hold that the parties were engaged in a joint fraudulent undertaking and the only question remaining is whether this suit is brought to enforce any right springing from it. The wrongdoing which will defeat a litigant must have connection with the matter in litigation. Misconduct in outside matters will not have such effect. A new contract upon a new consideration is not necessarily unlawful because it relates to property acquired through unlawful transactions. The real test in such a case as this is whether the plaintiff requires any aid from the fraudulent transactions to establish his demand. If he does, he cannot recover. If he does not, and the cause of action is unconnected with the fraudulent undertaking and is founded upon a collateral consideration, he may recover. As said by the Supreme Court of the United States in Armstrong v. American Exchange Bank, 133 U. S. 433, 469, 10 Sup. Ct. 450, 461 (33 L. Ed. 747):

"An obligation will be enforced, though indirectly connected with an illegal transaction, if it is supported by an independent consideration, so that the plaintiff does not require the aid of the illegal transaction to make out his case."

These principles are not questioned by the parties. Their differences arise in the application of them. Thus, on the one hand, the plaintiff contends that in order to establish his rights he does not rely upon, and need not show, any of the transactions alleged to be fraudulent or unlawful; that having shown that the money sent by him to Granfield belonged to him he is not required to prove how he got it in order to entitle him to an accounting. On the other hand, the defendant contends that the court cannot grant the plaintiff the relief prayed for without unraveling and taking account of all the fraudulent transactions between the parties and without, in effect, basing its decree upon the fraudulent undertaking.

In our opinion, the question whether the contention of the plaintiff or that of the defendant is correct depends largely upon whether the dealings between the parties should be considered as separate and unconnected transactions, or as transactions which together constituted one continuous enterprise. If the only relations between the parties were intermittent and Granfield's duty confined to the application of each remittance the inquiry might well be whether he did his duty in each case, and might not involve any question as to how Primeau obtained the money which he sent. But, in our opinion, the dealings between these men constituted a continuous undertaking and not a series of separate transactions. It is clear that they regarded themselves as continuing and responsible associates and that each helped the other. Their relations were continuous; lasted some eight years, and embraced the disposition of hundreds of thousands of shares. Primeau sent Granfield money to purchase stock. Granfield

returned the shares and lent aid in selling them. Primeau sent back the proceeds to buy new shares, and so on. Granfield got his profit on each share and the more shares Princau could, by false representations or otherwise, sell (and again buy), the more his (Granfield's) profit. Primeau made a larger profit on each share, and the more Granfield could aid him to dispose of the more money could be sent on to buy more shares, and thus continue the process. The sending of the money was only one step in the plan of operations. We fail to see how we could require Granfield to account for the moneys received by him without inquiring into the real transactions between the parties, and if we did, it would necessarily appear that the moneys sought to be accounted for were sent to Granfield in pursuance of the fraudulent scheme. The court would not be dealing with a matter outside the fraudulent transaction. On the contrary, it would be called upon to impress a trust upon moneys sent in furtherance of it. The cause of action cannot be said to be unconnected with it.

Obviously there could be no accounting in this case if Granfield had been entitled to share in the profits derived from customers. That would involve a direct accounting of the fraudulent enterprise. But we think it likewise follows that there could be no accounting if Granfield had been entitled only to a fixed and certain commission on the shares delivered to Primeau. If these men were parties to a scheme to defraud by selling worthless securities the court would, in our opinion, be taking action based upon the unlawful agreement if it were to order Granfield to account for moneys sent to purchase securities to be wrongfully disposed of; and it would be taking such action just the same whether Granfield's reward in a particular instance were fixed and certain (but in the long run dependent upon the success of the enterprise) or were a direct share in the profits derived from sales.

For these reasons we think that the plaintiff cannot establish his case without the aid of the fraudulent transactions, and that the bill should be dismissed. Consequently, the decree of the Circuit (now District) Court is reversed and the cause remanded with instructions to dismiss the bill. The suit is of such a nature that neither party is awarded costs against the other, either in this court or the court below.