## American University, Appellee, v. D. E. Wood and Chicago University of American Sciences, Appellants.

### Gen. No. 24,335.

1. CORPORATIONS, § 33*—*when question of de jure character of corporation cannot be considered.* On a bill by a corporation to restrain a competitor from interfering with its business, the question whether there was any irregularity in the organization of the complainant which would prevent it from being a corporation *de jure* cannot be considered.

2. CORPORATIONS, § 33*—*how question of defect in organization of corporation cannot be raised.* The question whether there is a defect in the organization of a corporation which will prevent it from being a corporation *de jure* cannot be raised collaterally, but can only be presented in a direct proceeding by information in the nature of a quo warranto.

3. CORPORATIONS, § 480*—*right of de facto corporation to sue to enjoin interference with business.* A corporation which is a corporation *de facto* and could lawfully do the business it purports to do under its charter, as a *de jure* corporation, may maintain a suit to enjoin a competitor from unlawful interference with such business.

4. CORPORATIONS, § 34*—*when de facto corporation exists.* A corporation *de facto* exists where the law authorizes such a corporation and where the corporation in question has made a bona fide attempt to organize and incorporate under such law and has proceeded to transact business as a corporation, even though it has not filed its final certificate of incorporation in the recorder's office as required by statute.

5. CORPORATIONS, § 59*—*who estopped to deny legal organization of corporation.* The rule that one who has dealt with a corporation as a corporation existing *de facto* is estopped to deny, as against it, that it has been legally organized, applied to estop one who had been formerly president and director of such corporation, and also

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

to estop another corporation of which he appeared to be the dominant spirit.

6. INJUNCTION, § 206*—*when right to injunction defeated by want of clean hands.* On a suit to enjoin defendants from interfering with complainant's business, evidence reviewed and complainant *held* not entitled to relief in equity as not coming into court with clean hands. (TAYLOR, J., dissenting.)

7. EQUITY, § 66*—*when maxim of clean hands applies.* It is unnecessary, for the application of the maxim of clean hands, that complainant's misconduct should be directed against the one invoking the maxim, but the relief will sometimes be refused even where the misconduct is against third persons and though defendant himself has been or is a guilty participant therein and may profit indirectly by the refusal of the court to act.

Appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1918. Reversed and remanded with directions. Opinion filed December 10, 1919.

FREDERICK MAINS, for appellants.

HARRIS F. WILLIAMS, for appellee; E. M. VOTAH and C. B. GREEN, of counsel.

MR. PRESIDING JUSTICE THOMSON delivered the opinion of the court.

This is an appeal by the defendants from a decree granting the complainant, American University, the relief prayed for in the bill filed by it.

The complainant received its certificate of complete organization as a corporation from the Secretary of State of Illinois in 1911 but that certificate has never been recorded in the Recorder's office of Cook county as required by section 4 of chapter 32 of our statutes (J. & A. ¶ 2421). The corporation nevertheless proceeded to do business and has ever since been engaged in the pursuit of its corporate objects, chief of which has been the teaching of what is known as chiropractic, by correspondence through the mails. Its present name and also the corporate object just referred to

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

American University v. Wood et al., 216 Ill. App. 189.

were brought about by an amendment to its charter made in 1913, which amendment was recorded in the Recorder's office of Cook county, where its place of business is, but the record fails to show that this change in name and objects was ever published as required by our statutes.

The defendant Wood became associated with complainant in 1913. He acquired some stock in the corporation and was elected its president and acted in that capacity for some time. His duties were in connection with the so-called "professional work" of the complainant,—the preparation of its advertisements and literature and in a part, at least, its correspondence course in chiropractic. Wood's interest in the complainant corporation was a minority interest and in December, 1916, he was eliminated by those in control. Before quitting the complainant's premises, however, Wood and one Smith, who became president of the defendant corporation, the so-called "Chicago University of American Sciences," which was organized January 15, 1917, removed therefrom certain papers and files belonging to complainant, including lists of its students and prospective students. Shortly thereafter defendants began sending out to those whose names were on these lists, a series of communications, advising them if they were students of complainant and had paid their fee in full for its correspondence course, to demand their money back inasmuch as they had been deprived of the personal services of defendant Wood as an instructor, and if they had not paid their fee in full, to pay no more and if they had not enrolled as students with complainant as yet, to pay no further attention to them but to enroll with the defendant Chicago University. These communications alleged that the course offered by complainant was full of "weaknesses"; that defendants could give far better service in their course in chiropractic; that the majority stockholders of complainant cared nothing about what their students got out of

their course but were merely after their money; that their policy was, "the students be damned"; that those addressed were to beware of "so-called schools, colleges or universities that are merely stock companies incorporated as a commercial enterprise to make dividends for stockholders"; referred to the defendant corporation as "the great University of Chicago with its 25,000 correspondence students, and other endowed institutions incorporated not for profit"; referred to complainant as giving a cheap "mail order" course and to the defendant "University" as an educational institution conducted under State control and not for profit; that "you enroll with this great Chicago University under a double guarantee of complete satisfaction or money refunded—Dr. Wood's personal guarantee, never before given or permitted, and ours"; suggesting a plan to students enrolled with complainant, whereby they might defeat any efforts it might make to have them complete their agreements with it; urging them to "enroll with us now"; referring to a valuable twelve volume reference library, "we are giving away as a free gift to all our students taking my complete course in chiropractic," adding, "I also wish to explain very clearly that it will *not* be necessary for *you* to study these books *all through* before you receive your University Diploma and honors, and become a Doctor of Chiropractic. * * * I can and *will* help you *attain* your fondest ambitions. I *guarantee* it. This is all I can do now, until you take me at my word and accept my offer. I urge you—for your sake—to enroll for this complete course in chiropractic *right now*"; another "urging and strongly advising" those who had been students with complainant when Wood was connected with it, to sue complainant for the return of their tuition money as they had been defrauded and wronged and to send a "Dr. Moser" power of attorney to act for them and one dollar in connection with a joint suit which was suggested;—and considerable more along these same lines which it

would serve no purpose to mention. Some of these communications were signed by Wood, some by the so-called Chicago University of American Sciences by Smith as president and some by both.

After the defendant Wood had left the complainant and after he had sent out several of the communications referred to, the complainant and he came together and had a settlement of their affairs by which he turned back his stock in the complainant company and in turn received a note of his which complainant held and further the sum of $1,000 in cash and also he agreed in writing to deliver all the documents and effects belonging to complainant which he had in his possession, within 48 hours, and also that he would not, in the future, address and send to the students and customers of complainant any more letters or documents of the kind complained of or in any way interfere with the business of the complainant. Wood, however, did not deliver the lists to complainant nor cease sending out the communications complained of.

The decree perpetually restrained and enjoined both defendants from writing, printing, publishing and circulating the communications referred to or any like documents or letters among the students or prospective students of the complainant and from advising them in any manner whatsoever to cancel or default in their contracts with the complainant, and it further enjoined defendants, their agents, solicitors, attorneys and employees from combining, confederating and conspiring together for the purpose of in any way meddling or interfering with complainant's business, and especially for the purpose of writing, publishing and sending letters or circulars such as those complained of in the bill and shown by the evidence, or of like kind, to the students or prospective students of the complainant.

In urging that this decree be reversed, the defendants first contend that the complainant has no existence as a corporation, either *de jure* or *de facto* and,

therefore, as such, it has no standing in a court of equity and is entitled to no injunction for the protection of a business conducted by it as a pretended corporation without legal existence. There are two reasons why this contention cannot be maintained. The question whether there was any irregularity in the organization of the complainant corporation, which would prevent it from being a corporation *de jure* cannot be considered by us in such a proceeding as the one at bar. Such a question cannot be raised collaterally but can only be presented in a direct proceeding by information in the nature of a quo warranto. If the complainant is a *de facto* corporation and if it could lawfully do the business it is purporting to do under its charter, as a *de jure* corporation, then it may maintain this proceeding, and in it the question referred to is in no way involved and cannot be raised. *Gillette v. Aurora Rys. Co.*, 228 Ill. 261, 276; *Woodland Social Entertainment Ass'n v. Anderson*, 187 Ill. App. 507; *Bushnell v. Consolidated Ice Machine Co.*, 138 Ill. 67, 74. A corporation *de facto* exists where the law authorizes such a corporation and where the corporation in question has made a bona fide attempt to organize and incorporate under such law and has proceeded to transact business as a corporation, even though it has not filed its final certificate of incorporation in the Recorder's office as the statute requires. *Marshall v. Keach,* 227 Ill. 35. Our attention has been called to a reference to this latter case by our Supreme Court in *People v. Mackey,* 255 Ill. 144, 158, but the question involved in the reference is in no way involved here. It was there held that a corporation cannot complete its *de jure* existence by filing its certificate of complete organization in the Recorder's office, after 2 years from the date of that certificate, and that anything the court may have said, in deciding the issues involved in *Marshall v. Keach,* must not be construed otherwise. The questions involved in these two cases are entirely different and must not be confused. Although, as held in

*People v. Mackey,* a corporation cannot complete its *de jure* existence by filing its certificate of complete organization in the Recorder's office, after 2 years from the date of that certificate, nevertheless, as held in *Marshall v. Keach,* if the company has become a *de facto* corporation within the period of 2 years, it continues to be such beyond the 2-year period, and as long as it exercises its corporate functions and although, at any time it could be wound up and caused to cease doing business as a corporation, in a direct proceeding by quo warranto, its existence as a corporation cannot be attacked collaterally, as defendants have attempted to do in the case at bar. *Bushnell v. Consolidated Ice Machine Co.,* 138 Ill. 67, is to the same effect.

The second reason why the contention of defendants referred to cannot be maintained is that, having dealt with complainant as a corporation, existing *de facto,* they are estopped to deny, as against it, that it has been legally organized. *Bushnell v. Consolidated Ice Machine Co., supra.* The defendant Wood was formerly the president of the complainant corporation, and one of its directors, and we have no doubt from the record in the case that he is the moving and dominant spirit in the defendant corporation, and consequently it occupies no better position than he does in this matter. Neither defendant is in any position to question the existence of the complainant as a *de facto* corporation. *The Joliet v. Frances,* 85 Ill. App. 243; *Curtis v. Tracy,* 169 Ill. 233. We deem these cases in point although not involving issues precisely similar to those involved in the case at bar. See *Burwash v. Ballou,* 132 Ill. App. 71. Defendants have called our attention to a number of cases which they contend are to the effect that they cannot be estopped to question the existence of the complainant as a corporation. They are not in point. Most of them have to do with *ultra vires* contracts which are void and therefore involve an issue which is in no way presented here. That the com-

plainant is a *de facto* corporation, seems to be fully established by the evidence in the record.

The defendants contend that complainant should be afforded no relief, as prayed for, because it does not come into equity with clean hands, as complainant itself has been guilty of deceitful advertising in connection with its correspondence course in chiropractic, is running a "doctor factory," conferring degrees of "doctor of chiropractic" on persons without personal attendance or supervision in tests of scholarship and that the maintenance of such an institution, falsely pretending to be an institution of learning with an extensive organization, with several schools or colleges united and affiliated, but each presumably having its own faculty, is against public policy. The complainant contends that the maxim of clean hands has no application here,—and that it can only be applied to the transaction immediately involved and that inasmuch as it is not contended that chiropractic is not a legitimate proposition and there is nothing in the record to show any inequity or fraud or unfair dealing on its part towards the defendants, in connection with the matter in controversy in this case, the court may not concern itself with the question of whether the complainant has defrauded others or is so doing.

From the series of letters and communications, appearing in this record, which were sent to prospective students by both of the so-called "Universities" involved in this case, it would seem that the argument just referred to amounts to the "pot calling the kettle black." However, in our opinion the point raised is decisive of the issues in this case.

Pomeroy in his Equity Jurisprudence (4th Ed.), vol. 1, sec. 399, says: "The maxim, considered as a general rule controlling the administration of equitable relief in particular controversies is confined to misconduct in regard to, or at all events connected with, the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the

two parties, and arising out of the transaction; it does not extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern." To the same effect is 16 Cyc. 148; *City of Chicago v. Union Stock Yards Co.*, 164 Ill. 224; *Mossler v. Jacobs*, 66 Ill. App. 571. In the *Stock Yards* case, *supra*, it was not charged that complainant had committed acts which were *malum in se* or contrary to public policy, but that it was pursuing a course of conduct which was ultra vires, and the court held that the maxim of clean hands could not have any proper application to such a situation and that the commission of ultra vires acts by a complainant, which were not connected with the subject-matter of the relief it was seeking in equity, could not amount to a violation of the requirement that it come into equity with clean hands, before it could put itself in a position to obtain the relief sought. In the *Mossler* case, *supra*, the complainants who had established and for many years successfully conducted a tailoring business under the name and style of "Six Little Tailors," sought to restrain the defendants from using the name of "Six Big Tailors," in connection with a similar business which they had recently established. Among other things, the defendants alleged that "some of the advertisements" put forth by complainants were manifestly untrue and that, therefore, they had not come into equity with clean hands, and should be denied relief. In deciding against the contention of the defendants, the court quoted the section of Pomeroy's Equity Jurisprudence above referred to. In that section the author further says, that "when a court of equity is appealed to for relief it will not go outside of the subject-matter of the controversy, and make its interference to depend upon the character and conduct of the moving party, in no way affecting the equitable right which he asserts against the defendant, or the relief which he demands."

In our opinion these authorities are not in point. By the allegations which are contained in the bill complainant has filed in the case at bar, it is shown that the subject-matter of the charge of unclean hands, which the defendants are here insisting upon, is a part of the subject-matter of the controversy of the parties. Unlike the *Stock Yards* case, *supra,* there is no question of ultra vires acts involved in the case at bar. Unlike the *Mossler* case, *supra,* the character and conduct of the complainant, which the defendants contend should prevent a court of equity from taking the action for which the complainant prays, is such as does affect the equitable right which it asserts against the defendants and the relief which it demands. The complainant has come into a court of equity asking that the defendants be compelled to return to it the list of the names and addresses of its students and prospective students and that the court restrain the defendants from further communicating with those whose names are on that list and from making the statements about complainant which are complained of and from thus interfering with complainant in the conduct of its business. In this connection the complainant alleges in its bill that the aforesaid list of names is "its most valuable asset," together with the good-will of its students and prospective students and others influenced by them; that the statements made by the defendants in the communications complained of are false, and continuing, complainant alleges in its bill that: "Your orator has always borne a good reputation for integrity, stability and honesty; the officers and directors are possessed of good reputations for honesty and integrity, capable of managing and always have managed your orator's business successfully, honestly, conservatively, and properly."

In the answer filed by the defendant Wood, he specifically "alleges the fact to be that the complainant does not come into equity with clean hands; that said complainant in the conduct of its said business is per-

petrating a fraud upon the public and upon the students or persons enrolled with the complainant; that said complainant does not give or attempt to give to the persons so enrolled with it, the instruction advertised by the complainant   *   *   *   and that the business of the complainant as conducted is in other words unlawful and a fraud upon the public,'' and the answer further alleges that the contract or agreement entered into by the complainant and Wood was not entered into by the complainant in good faith.  In the answer filed by the defendant Chicago University of American Sciences, that defendant denies ''that the complainant has always borne a good reputation for integrity, stability and honesty   *   *   *   and alleges the fact to be that the complainant does not come into equity with clean hands.''  This answer further denies that the purpose for which the complainant is organized is as alleged by complainant in its bill and set forth in its charter, ''that the purpose for which the complainant is conducted is the making of money by a false and fraudulent means,'' and it is further alleged that in its catalogues and advertisements the complainant purports to have a large faculty and that the lessons or lectures which it sends out are not, as the public would be led to believe from such advertisements and catalogues, the work of any such faculty. Thus by their pleadings the parties have made this matter of clean hands an issue in this case. We are of the opinion that the charge of unclean hands, made in the answers filed by the two defendants, is made out by the proofs, and further that the maxim invoked applies to this case inasmuch as the relief sought by the complainant is inseparably connected with its own wrongful conduct, and if a court of equity granted that relief, it would thereby be giving its approval to that conduct.  Complainant and defendant Wood, now ''Chancellor'' of defendant, Chicago University, were formerly engaged together in conducting complainant's fraudulent business.  Complainant put Wood

out, whereupon he circularized complainant's students and prospective students, telling them that complainant is a fraud and complainant comes into a court of equity seeking to restrain defendant from "interfering with its business." The case at bar is, therefore, one presenting a situation to which the quotation from Pomeroy above referred to, and the cases there cited, do not apply, but rather one which is covered by that author in section 401 of his work on Equity Jurisprudence, where he says: "Whatever be the nature of plaintiff's claim and of the relief which he seeks, if his claim grows out of or depends' upon or is inseparably connected with his own prior fraud, a court of equity will, in general, deny him any relief." *Primeau v. Granfield,* 193 Fed. 911; *Farrow v. Holland Trust Co.,* 74 Hun (N. Y.) 585, 26 N. Y. Supp. 502.

The maxim of clean hands, not being for the benefit of the defendant, but of the court itself, representing equity and justice, it is quite unnecessary for its application that the complainant's misconduct should be directed against the one invoking the maxim, but the relief will sometimes be refused even where the misconduct is directed against third parties and although the defendant himself has been or is a guilty participant therein, and may profit, indirectly, by the refusal of the court to act. 16 Cyc. 145; *Kassing v. Durand,* 41 Ill. App. 93; *Primeau v. Granfield,* 193 Fed. 911; *Cornellier v. Haverhill Shoe Manufacturers' Ass'n,* 221 Mass. 554.

A consideration of the evidence in the record relating to the course pursued by the defendant Wood when he was connected with the complainant, and after his association with the complainant ceased and since the organization of the defendant Chicago University of American Sciences and the type of circulars and advertising matter issued by him and by the two so-called Universities involved in this suit, would incline us to the opinion that his allegation that the complain-

ant is a fraud and a "diploma mill" and a "doctor factory" was fairly well established by the fact that he himself was for some time the complainant's president and had much to do with its policy and the preparation of its advertising matter, as the record shows.

But the record discloses more than that. After filing an opinion in this case, complainant's petition for a rehearing was allowed, largely because it was therein asserted that this court had been led to hold that the complainant had not come into court with clean hands, by reason of many matters contained in the abstract of the record which had been compiled and filed by the defendants, which matters were not borne out by the record itself. We have carefully examined the record in this case and find there full support for all the facts, here referred to as a ground for holding, as we do, that the complainant is not in court with clean hands and therefore must be denied the relief which it seeks.

Complainant's contention that such false, fraudulent or otherwise objectionable statements that its catalogue and other literature may have contained, were incorporated therein by Wood when he was the president of the complainant "University" and that after complainant got rid of him it also changed the advertising literature for which he was responsible, is not borne out by the record. Much of this matter which we consider fraudulent in its representations is contained in the complainant's catalogue, which the evidence shows was in use at the time this suit was on hearing and which was practically a copy of the catalogue in use when Wood was complainant's president. Much other matter of the same character is contained in the communications and circulars found in the record, most of which bear date after Wood ceased to have any connection with the complainant.

What are the elements that go to prove the charge of fraud made against complainant in this case? It

holds itself out as a "University." All through its literature and correspondence we find language, seeking to convey to the minds of the credulous, the impression that the complainant is a "University," within the commonly accepted meaning of that word. In a circular sent out by complainant after Wood left it, for the purpose of counteracting the effect of the circulars the defendants were mailing out to some of complainant's students, complainant tells those addressed that they need its diploma, adding: "It has the prestige of a great University behind it." Many references are made, in complainant's catalogue and other advertising matter contained in the record, to the "Department of Chiropractic" of the American University. Other references are made to the "various members of our University faculty" and it is stated that "each and every member of the faculty is a recognized specialist" and also that "each and every instructor has proven the virtue of his principles by actual, active and extended practice thereof." The literature of complainant assures those to whom it is sent that its "Department of Chiropractic" enjoys a wide reputation "by reason of the character and personal reputation of the members of its faculty." The faculty is represented as being superior to that of any similar institution, "in point of qualifications, experience and active practice in the branches taught." By their circulars complainant represents that its "instruction is given by men with years of experience in teaching successfully by correspondence"; the prominence in the profession required of "every member of the faculty" is referred to; it is represented that the lessons in Chiropractic are the work of "many able minds" and that the course "is the work of the combined intelligence of many professionally trained men, and is not a 'one man course.'" Much of the literature is signed by one designated as the "Registrar" of the University.

American University v. Wood et al., 216 Ill. App. 189.

The evidence shows that this "great University" occupies the third floor in a building at 81 West Randolph street, in Chicago, and that it consists of F. S. Tinthoff, his brother S. J. Tinthoff and Dr. W. F. Le Boy. It is conclusively shown by the record that F. S. Tinthoff is the chief figure in the complainant "University." He testified that he was not a professional man and knew nothing whatever about Chiropractic, nor did his brother S. J. Tinthoff, and further that he was personally interested in the "University" from a financial point of view and for the money he got out of it. The evidence as to "each and every instructor" and "member of the faculty of the Department of Chiropractic" of complainant "University" showed that they consisted of Dr. Le Boy. The secretary of the "University" was S. J. Tinthoff and it is clear that he is the one chiefly responsible for it. On cross-examination he was questioned as to the "many able minds" which had contributed to the creation of the "University's course in Chiropractic" and he testified that he could not name the men of the faculty; that "Dr. Wood arranged for those,—I don't carry the names." He finally said the name of one was "Smith" but that he never met him personally and did not know where he lived; that he could not name any of the eight or nine doctors who prepared the course in Chiropractic and that he knew none of them personally. This lack of information as to "each and every member of our faculty" on the part of this man, one of complainant's officers and apparently the main one of its three directors ever since the complainant was incorporated and down to the time of the trial of this case, is astonishing, in view of the representations in complainant's literature, to the effect that the officers of the University had selected all of them with such care and that the "wide and most favorable reputation of the Department of Chiropractic" was had "by reason of the character and professional reputation of the members of its faculty," and wherein it was claimed that the

faculty of the University's Department of Chiropractic was superior to that of any similar institution "in point of qualifications, experience and active practice in the branches taught" and that the "officers of the American University" had "required that every member of the faculty should be one standing prominently among the ranks of those possessing a full knowledge of Chiropractic, as well as having had a long and wide experience as active practitioners of the art of Chiropractic."

The evidence in the record shows clearly that Dr. Le Boy, the president of the complainant "University," constituted its "faculty," and that he did not square with the representations which complainant's literature made about him. In one of the letters in the record, complainant represents that "Dr. Le Boy has been in active practice of this profession for more than 12 years and has been closely allied with drugless healing methods." This letter is dated Feb. 19, 1917, just after Dr. Le Boy had become complainant's president, and was addressed to a student who had apparently received some of the literature circulated by the defendants. In complainant's literature, students and prospective students were given to understand that they would have the benefit of a professional supervision of their papers, in connection with the course offered by the Department of Chiropractic, by the faculty. Dr. Le Boy testified that he was a graduate of the Bennett College of Eclectic Medicine and Surgery; that he had practiced his profession for 12 years but that the statement that he had practiced "this" profession (Chiropractic) that length of time was not true. He also testified that he corrected all the lessons sent in by the students of the American University and that "the average time I would put in on each lesson would vary from two to ten minutes." Complainant's secretary, Mr. Tinthoff, testified that its president, Dr. Le Boy, received his degree in Chiropractic from the complainant in 1914, "after Dr. Wood had examined

him and found him competent." Dr. Wood testified that he signed and issued the diploma of complainant to Dr. Le Boy although the latter never completed the course and was never examined, either orally or in writing. Dr. Le Boy does not cover this point in the testimony he gave in this case. Mr. Tinthoff further testified that the students received the lessons of the correspondence course and also "the advice and attention that is known in any correspondence school that a student receives,—of the professional head," which, he stated in the case of complainant, was Dr. Le Boy. He testified that "the lessons are always corrected by one man and always have been," and that at that time he was Dr. Le Boy. Such, did the evidence disclose, were the qualifications of each and every "recognized specialist on complainant's faculty" and "his actual, active and extended practice of Chiropractic" and "his years of experience as a successful teacher" and "the prominence which had been obtained by every member of complainant's faculty," and this is all the evidence we find in the record tending to show the intelligence of the many professionally trained men of whom complainant's students were told, and such was the service the students received in connection with their course in Chiropractic. There is a good deal in complainant's literature about a "consulting staff," but from the testimony in the record we would conclude that it was even less substantive than the "University faculty."

It was represented by complainant in some of its literature that it could make its prospective students "full fledged Doctors of Chiropractic" and that they would not have the slightest difficulty in mastering the University's course of Chiropractic, "if you are able to read and understand plainly written English," and they were told that the average student completed the course in a few months. After complainant's students spent such a length of time on a correspondence course of the sort disclosed by the evidence we have referred

American University v. Wood et al., 216 Ill. App. 189.

to, and under such a "faculty" as the record shows this complainant had, paying therefor the sum of $68.75, they received a lithographed certificate, certifying that the possessor thereof was proficient in "Anatomy, Physiology, Diagnosis, Symptomatology, Etiology, Pathology, Hygiene, Therapeutics, and Art, Science and Philosophy of Chiropractic" and that he had received a degree of "Doctor of Chiropractic," from the "American University."

Complainant argues, as to this literature we have referred to, that the worst that can be said of it is that it may contain some exaggerations and some of what is known among advertisers as "puffing." We are of the opinion that the best that can be said of it is that it is a bare-faced fraud, and that complainant is shown to be what is commonly known as a "diploma mill," conducting such a business as our Supreme Court in *Illinois Health University v. People*, 166 Ill. 171, declared to be against the public policy of this State.

Counsel for complainant has called our attention to the language of our Supreme Court in *Barnes v. Barnes*, 282 Ill. 593, where it is pointed out that the maxim of clean hands "is limited in its application to where the substance of the thing is inequitable and the inequity must apply to the particular subject-matter. It is not sufficient to bar relief that conduct should relate to the proof of some item or some fact, and where the origin of the claim is not inequitable, a fraudulent act in relation to it will not bar relief." In this connection, counsel contends that Chiropractic is not a fraud and in substance it is contended that Chiropractic being the substance of the thing involved in this case, the maxim of clean hands under the language just referred to cannot be applied here. The question of whether Chiropractic or the teaching of Chiropractic by correspondence is or is not a fraud is in no way involved in our decision of this case. The particular subject-matter of the issues made up in the case at

American University v. Wood et al., 216 Ill. App. 189.

bar is not Chiropractic, nor the teaching of Chiropractic by correspondence, but rather the fact that the business of the complainant is shown by the evidence to be the selling of an alleged course in Chiropractic under the guise of a "great University" with a "Department of Chiropractic" and a "faculty," which is shown to exist only on paper and in the minds of those financially interested, and the conferring of degrees of "Doctor of Chiropractic" on individuals whose only requisite for enrollment seems to be "the understanding of plainly written English," and certifying them to be proficient in a number of highly technical and scientific subjects, after a course which the evidence shows cannot possibly have any such result.  The selling of diamonds by means of circular advertising could not be said to be fraud, but a complainant conducting such a business would not be tolerated in a court of equity for a moment on a bill seeking a permanent injunction against defendants who were circularizing complainant's customers, telling them that the diamonds they were buying were paste and urging them to buy of defendants, the evidence showing that in fact the articles dealt in by both parties were paste.  Complainants contend that the doctrine of clean hands might be invoked in this case if the teaching of Chiropractic was something the law did not permit, but inasmuch as the teaching of Chiropractic is lawful, the doctrine cannot apply.  With equal logic the "diamond merchant," engaged in selling paste, upon coming into equity, seeking the court's protection in the conduct of his business, might meet the contention that he had not come into equity with clean hands, with the proposition that that doctrine could not apply to him, as the selling of diamonds was a lawful business.

Chiropractic may or may not be a good thing.  We are not here called upon to pass on that question.  But we are of the opinion that the alleged course in this subject which this complainant is shown to be conducting and selling, under all the evidence in this record

to which we have referred fully, is calculated to deceive the public and operate as a fraud, and that complainant's business is contrary to public policy. An analogy is to be found in the trade-mark cases in which the jurisdiction of equity is founded on the right of property in the complainant and its wrongful invasion by another, where the courts have repeatedly held that the complainant must be free from fraud. In such cases the courts have said that any material misrepresentation in complainant's trade-mark, or other property he seeks to protect, deprives him of the right of relief in equity, although the defendant's conduct may be without justification. *Epperson & Co. v. Blumenthal,* 149 Ala. 125, 42 So. 863; *Joseph v. Macousky,* 96 Cal. 518, 31 Pac. 914.

In its petition for a rehearing heretofore referred to, complainant urges upon us that its business is worth $100,000 or more and that "it is scarcely believeable that a bare-faced fraud could make such a success." It is a matter of common knowledge that some portion of the public is being taken in on frauds all the time and that such frauds enrich their perpetrators in sums that reach the hundreds of thousands of dollars, and the fact that the fraud is successful does not make it the less a fraud.

We have in this case a "great University," which, in the commonly accepted meaning of the words, does not exist, graduating men with little or no education beyond the power to understand "plainly written English" as "doctors" proficient in "Anatomy, Physiology, Diagnosis, Symptomatology, Etiology, Pathology, Hygiene, Therapeutics, and Art, Science and Philosophy of Chiropractic," after a correspondence course of a few months, under the guidance of such a "faculty" as is disclosed by this evidence. It would be a tragedy for a court of equity to protect such a complainant by a permanent writ of injunction against those alleged to be interfering with "its business."

American University v. Wood et al., 216 Ill. App. 189.

After a careful consideration of this record we are of the opinion that each party should pay one-half of the costs in this court, and it is so ordered.

For the reasons stated the decree of the Circuit Court is reversed and the cause is remanded to that court with directions to dismiss the bill for want of equity.

*Reversed and remanded with directions.*

MR. JUSTICE TAYLOR dissenting. Ordinarily a corporation—and of course any individual—no matter what its character, may bring suit in a court of equity and the court is not entitled to refuse it a hearing or to give it relief simply because it may be conducting an illegitimate business, or what purports to be, in a way the court does not feel inclined personally to sanction. The fact that it claims to be an educational institution and, further, makes extravagant claims concerning its capacity to educate those who become members does not take away from it the right to sue or relieve it from the obligation to be sued. Jurisdiction is not dependent upon the reputation or character or quality of the suitor. Pomeroy's Equity Jurisprudence, vol. 1, sec. 399. If the converse were true, one chancellor, believing—for example—that osteopathy or a correspondence school is a humbug, might refuse such an organization a hearing; while another, believing it of great virtue, would take jurisdiction. That would lead to uncertainty and breed litigation. In the furtherance of its business a corporation may be shown to be indulging in extravagant "deal talk" or in the grossest hyperbole, yet, as long as it is allowed by the officers of the State to exist as a corporation it is not thereby deprived of its standing in court and its right to have others prevented from stealing or undertaking to steal its property. The gravamen of the bill in the instant case was a perpetual injunction prohibiting the defendants from illegally meddling and interfering with and injuriously affecting a certain part of the business of the complainant. Whether or not, by and

# 210

large, it was conducting itself as a valuable or vicious institution of learning or in any such way that its conduct would justify quo warranto proceedings, is not before us; such questions may be answered only by apt proceedings instituted by the proper officers of the State.

Inasmuch as it is admitted by the opinion of the majority that the complainant is a *de facto* corporation, it follows that, as such, it is entitled to sue and be sued; and as the special subject-matter of the litigation in the instant case does not in any way involve a question of fraud on the part of the plaintiff, obviously what it asks for would readily be granted were it not that the court does not like the way in which, at large, it is conducting its business.

The essence of the bill is the misconduct of the defendants in that they were sending letters to the students or prospective students of the complainant advising them to cancel or default in their contracts with the complainant; and the question is, the legality of the conduct of the defendants in communicating with the students and prospective students of the plaintiff. That, it will be seen, is an entirely different subject-matter, and clearly segregated from the conduct of the plaintiff in relation to its own students and prospective students or its relation to the public.

Pomeroy says, as quoted in the majority opinion, that the doctrine of clean hands "does not extend to any misconduct however gross which is unconnected with the matter in litigation and with which the opposite party has no concern."

In the *Manhattan Medicine Co.* case, 108 U. S. 218, the court held that as the complainant was selling a bottle of medicine which had on it a fraudulent, untrue label, it had no right to ask a court of equity to protect that particular deception. That is sound. If here chiropractic were a fraud, the same principle would be applicable. In *Uri v. Hirsch,* 123 Fed. 568, the court merely held that a trade-mark containing a false

representation will not be protected, and the diction quoted from that case, that such a complainant should be turned out of court, is good law. But the case and all it contains is not in any way apt here.

The *Mossler* case, *supra,* contains the nearest parallel to the instant case and the Supreme Court there held that the doctrine of clean hands did not apply. The *Illinois Health University* case, *supra,* was—what this cause should be—a quo warranto proceeding, and the court very properly held that the charter of the so-called University should be revoked. If the instant case were quo warranto, the reasoning of the majority opinion might be irresistible. But a court of equity does not revoke a charter, nor do the equivalent; it has no such power. It is stated, further, in the majority opinion that the "complainant business is contrary to public policy," and yet it is admitted that the complainant is a duly chartered corporation, entitled to sue and be sued, and that chiropractic, its chartered purpose, and which it is entitled to teach, is legitimate. In the trade-mark case, *Epperson & Co. v. Blumenthal, supra,* as in the *Manhattan Medicine Co.* case, *supra,* the court held properly that the trade-mark, as used, announced that which was false, and that that particular misrepresentation would not be protected. And, in the *Joseph* case, *supra,* the court refused to protect, as a trade-mark, certain words stamped on razors, which words were false. The principle sanctioned by the majority opinion does not seem to be supported by any known decision. And, if that principle becomes the law, there is not a single corporation, industrial, political, educational, charitable or religious, that may not, every time it appears in a court of equity, have its standing and its right to sue challenged; thus turning over to a court of equity the well-recognized function of the Attorney General.

Of course, bearing in mind what the evidence shows, it might be well and for the public good that the busi-

ness of the complainant be investigated, and, if found to be vicious, its charter revoked. Being of the opinion, however, that the complainant is a duly chartered corporation and, according to well-known principles of our equity jurisprudence, entitled to have the matters involved in the bill of complaint considered by the court—apart from what it may be doing or trying to do, as a so-called educational institution, at large—I am constrained to dissent. *City of Chicago v. Union Stock Yards Co.*, supra; *Mossler v. Jacobs*, supra; 11 Am. & Eng. Encyc. of Law (2nd Ed.) 164; Pomeroy's Equity Jurisprudence, vol. 1, sec. 399.