**FIDELITY & DEPOSIT CO. OF MARY-LAND v. GRAND NAT. BANK OF ST LOUIS.**

No. 9716.

District Court, E. D. Missouri, E. D.

Feb. 20, 1933.

Bryan, Williams, Cave & McPheeters and Henry Davis, all of St. Louis, Mo., for plaintiff.

Charles G. Revelle and Courtney S. Goodman, both of St. Louis, Mo., for defendant.

DAVIS, District Judge.

Plaintiff issued bankers' blanket bonds, aggregating $150,000, by which it agreed to indemnify defendant against loss of money or securities through robbery. On May 25, 1930, the bank was robbed of cash and securities of a value of about $824,000. The portion of the property covered by the indemnity bonds was the cash amounting to $46,895.82, and bonds of the value of $236,-950. Proof of loss was filed, and on September 19, 1930, the plaintiff settled the claim by paying to defendant $125,000.

Subsequently the bonds, but not the cash, were returned. Plaintiff brings this action to recover the amount of the loss paid by it, less the amount of the cash which was not recovered. The defendant filed an answer and a counterclaim, in which it asserts that, under the bankers' blanket bonds, the plaintiff was, in case of the recovery of the property, obligated to pay "the actual cost and expense of making same;" consequently, as the bank paid $140,000 for the recovery of the entire amount of the bonds, plaintiff is obligated to

defendant for its "pro rata share" of that expenditure. There are other lesser items in the demands of each party against the other, but the above statement in a general way outlines the issues.

The parties waived a jury, and the cause was on the evidence submitted to the court.

The negotiations that actually led to the recovery of the stolen securities commenced in December, 1930, and continued until February 20, 1931, on which day the property was returned. Emmett M. Myers, plaintiff's resident vice president, was the active agent in these negotiations. When he learned in December that the "underworld" was ready to treat with the bank with the view of surrendering the bonds, the information was communicated to Edward Mays, president of the defendant bank. Then followed a series of private conferences at the bank, between these two individuals. The first proposition was that the robbers would retain the cash stolen, $46,895.82, and would return the bonds for $200,000. Myers and Mays were agreed that this was too much, so that they countered with the suggestion that $100,000 be paid. This was not satisfactory to the "underworld," but they offered to accept $175,-000. This and other offers and counter offers were carried back and forth from the agents of the robbers to the president of the bank, until on January 15, 1931, the plaintiff and the defendant agreed to pay, and the robbers agreed to accept, $140,000 for the return of the bonds. This sum was to be paid, and was paid, by the bank. But the president of the bank asserts, and the resident vice president denies, that the plaintiff bonding company was to pay its "pro rata share" of this amount.

After the amount was agreed upon and put up by the bank in the hands of plaintiff's resident vice president, further negotiations as to the time, place, and manner of delivery were largely in the judgment and discretion of the plaintiff's said agent. During these dealings Myers took the list of stolen bonds as prepared by the bank "and had the people who had the bonds to check against this list," and they reported back to Myers, "that they had all of the bonds listed and approximately twenty thousand more." They were "honorable men." The bonds were delivered to the resident vice president of the plaintiff, but when, where, and by whom, the evidence does not disclose. Plaintiff turned all the securities over to the president of defendant bank in the safe deposit vault of a downtown bank on February 20, 1931. The ransom

paid, the delivery of the bonds completed, the police were called to safely convey the property to the defendant bank.

Plaintiff stresses the point that it did not pay or agree to pay any portion of the ransom, on the theory presumably that it acted in good faith, and is not tainted with even the least impropriety. But it must not be overlooked that plaintiff was equally interested, with defendant, in the return of the bonds. It had paid a substantial indemnity for loss of the securities, and, according to the terms of the bankers' blanket bonds, was entitled to be reimbursed in the event of the recovery of the stolen property. The resident vice president made a trip East, where advice was sought from superior officers of plaintiff as to the course to be pursued in this matter. It was in furtherance of instructions thus received that he consummated negotiations that led to the recovery of the stolen bonds. The president of the bank had no information on this particular subject save such as Myers communicated, and Myers was very cautious and circumspect, by no means revealing all the facts in his possession. Consequently, the fact that plaintiff says it did not agree to pay any part of the ransom is not of particular importance. Plaintiff and defendant, both having a pecuniary interest, mutually and jointly consummated the recovery, and are equally responsible for participating in that transaction, whatever may be its character. Plaintiff ought not be heard to say, "Sir, it was my partner made that bargain, not myself."

During the period of from six to eight weeks that plaintiff and defendant were actively negotiating for the return of the stolen property, the evidence shows that the dealings between these parties were treated by them as strictly confidential. Into that confidence no other individual, save the attorney for the bank, was admitted, and he on only one occasion. The well-guarded evidence which the court was privileged to hear shows that the peace officers of this community were furnished no information about the plan in prospect. A proper inference from the testimony is that plaintiff and defendant purposely withheld and concealed from the officers of the law all information in their possession about the significant fact that the agent of the robbers was known, and that the parties to this suit were planning to turn over an immense sum of money for the production and return of the securities.

The court is importuned by both parties to view this as an ordinary business trans-

action, and adjudicate the rights of the parties as they have been altered by the return of the stolen property. These litigants take their stand on high ground and consistently refuse to yield that advantage. They cannot be induced to mention, or even contemplate, such odious terms as "theftbote" or "compounding a felony."

The Missouri statute, R. S..1929, § 3894 (Mo. St. Ann. § 3894), provides that any "agreement or undertaking, express or implied, to compound or conceal such crime, or to abstain from any prosecution therefor, or withhold any evidence thereof," shall constitute an offense. Such an undertaking may, and usually must, be implied or inferred from the circumstances existing in any particular case. A formal agreement is by no means necessary. Mississippi Valley Trust Co. v. Begley, 298 Mo. Sup. 684, 252 S. W. loc. cit. 83.. In Malone v. Fidelity & Casualty Co., 71 Mo. App. 1, the defendant executed the fidelity bond of an embezzling employee and accepted notes in payment of the loss it had sustained. The fact that it recalled a detective who was working on the case was held to be substantial evidence that it had entered into an agreement to thwart the prosecution of the crime.

■ For this undertaking to pay money and recover stolen property to come under the ban of the law, it is not at all necessary that it should amount to the offense of compounding a felony. There are many illegal contracts that fall short of being crimes. Contracts which tend to interfere with the impartial exercise of government functions, to defraud, to give a preference to a debtor, to pass the goods of one maker for those of another, are instances of transactions that may be illegal, but may not be crimes.

The failure of one having knowledge of the commission of a felony to reveal his information to some one in authority is a crime under the federal statutes, 18 USCA § 251, and the same thing is true in some of the states. State v. Wilson, 80 Vt. 249, 67 A. 533. To advertise for the return of stolen goods, "no questions asked," has been held to amount to a crime, and in some jurisdictions is prohibited by statute. 25 Geo. II c, 36, 4 Blackstone 132.

■ An undertaking that has for one of its purposes the suppression of evidence is illegal, no matter whether the evidence relates to civil action or to a criminal prosecution. The same is true of any sort of an agreement that has as its object the aiding of a criminal to escape, or concealing the fact that a person has violated, or is violating, the criminal law. In Folmar v. Siler, 132 Ala. 297, 31 So. 719, 721, the court expressed the rule in this language: "That a contract, the consideration of which is in part illegal, is invalid and cannot be enforced at law, is a question too well settled to admit of doubt. * * * Neither can it be doubted that a contract based upon a promise or agreement to conceal or keep secret a crime which has been committed is opposed to public policy and offensive to the law." To the same effect, see, also, Case v. Smith, 107 Mich. 416, 65 N. W. 279, 31 L. R. A. 282, 61 Am. St. Rep. 341; Jones v. Henderson, 189 Ky. 412, 225 S. W. 34, 20 A. L. R. 1471; Aycock v. Gill, 183 N. C. 271, 111 S. E. 342, 24 A. L. R. 1449; Small v. Lowrey, 166 Mo. App. 108, 148 S. W. 132; Ridenbaugh v. Young, 145 Mo. 274, 46 S. W. 959; Josephs v. Briant, 108 Ark. 171, 157 S. W. 136.

Was the undertaking to recover these bonds under the circumstances such a transaction as is condemned by public policy? Of course, it is the position of both parties that there was no intention whatever that their efforts should stifle a criminal prosecution. But there cannot be the least doubt that the parties impliedly, if not expressly, agreed to consummate the matter in hand in such a manner as to prevent the officers of the law from getting any information about who the offenders were, who represented them, and where the securities were concealed, and who had them in possession. It cannot be supposed that the robbers would have dealt with plaintiff and defendant on any other terms. That wrongful purpose was clearly a part of the whole undertaking. Regardless of whether the parties compounded a felony, or became accessories after the crime, we have no hesitancy in concluding that they consummated a transaction that cannot be justified under the law.

■ The question of how close illegality must be woven into a transaction in order to taint it is often difficult to determine. The principle to be applied is one of general public policy, and the inquiry is not alone as to the effect of a particular transaction, but whether its tendency is in the direction of public detriment. The illegality of an agreement depends upon an affirmative answer to the question, Is the encouragement of this class of transactions against public policy? There can be but one answer to this question. The general approval of the course of conduct adopted in this case will result in the breakdown of the administration of the criminal law, and

render society absolutely helpless before the criminal class.

This lawsuit arises as a result of the recovery of stolen property in the manner above stated. The plaintiff states that the bonds having been restored to defendant, it is entitled to be reimbursed for having paid the loss. The defendant states that it has been compelled to make the entire outlay for the recovery of the securities, and that the insurance company is obliged under the terms of the indemnity contracts to pay its pro rata share of the expense of restoring the bonds. Consequently, the court is asked to determine rights and duties that arise as a result of the recovery, in the manner above stated, of the property lost in the robbery. This transaction being contrary to an enlightened public policy, is it the duty of the court to determine the rights of the parties as they appear at the consummation of the undertaking? The plaintiff and the defendant equally participate in this transaction, and the rule is clear. Under such circumstances, the law affords no relief to either party, but leaves them in the position they have placed themselves. "He that makes his bed ill, lies there." Jackson v. Columbia (Mo. App.) 217 S. W. 869; Boyer v. Garner (Mo. App.) 15 S.W.(2d) 893; Finley v. Williamson, 202 Mo. App. 276, 215 S. W. 743; Second Russian Ins. Co. v. Miller, 268 U. S. 552, 45 S. Ct. 593, 69 L. Ed. 1088; Rittenbaum v. Cohen, 29 Ga. App. 87, 113 S. E. 828; Anderson v. Craven (S. D.) 231 N. W. 538; Conte v. Busby, 115 Cal. App. 732, 2 P.(2d) 458; Hoge v. George, 27 Wyo. 423, 200 P. 96, 18 A. L. R. 469; Howe v. Chmielinski, 237 Mass. 532, 130 N. E. 56; Birrell, Inc., v. F. & C. Co., 193 Iowa 860, 188 N. W. 26.

Where it is necessary, as here, to prove an unlawful undertaking in order to maintain an action, the courts will not enforce it; nor will they enforce alleged rights springing from it. They should decline to supervise distribution among wrongdoers of spoils derived from unlawful conduct. Missouri F. & D. Co. v. Scott, 72 Okl. 59, 178 P. 122; Duane v. Merchants' Stamp Co., 231 Mass. 113, 120 N. E. 370; St. Louis, V. & T. H. R. R. v. Terre Haute & I. R. R., 145 U. S. 393, 12 S. Ct. 953, 36 L. Ed. 748.

The defense of illegality need not be set up by either party. The court acts in its own protection, and will refuse to stultify itself. Grudberg v. Midvale Realty Co., 119 Misc. 558, 196 N. Y. S. 760; Primeau v. Granfield (C. C. A.) 193 F. 911 (certiorari denied, 225 U. S. 708, 32 S. Ct. 839, 56 L. Ed. 1267);

McMullen v. Hoffman, 174 U. S. 639, 19 S. Ct. 839, 43 L. Ed. 1117.

There is one demand in the counterclaim that is not related to the matter above discussed. It was shown by the evidence that on May 27, 1930, defendant had a loss of $3,600 in the cage of one of the tellers at the bank. But the testimony did not show how the loss occurred, and it may have been caused by a shortage due to error of the teller, and thus not covered by the indemnity bond. For this reason the finding will be against the defendant on this item of the counterclaim.

Suggested findings of fact and conclusions submitted by the parties have been marked "given" and "refused," and are filed herewith. Exceptions to adverse rulings thereon are allowed.

Judgment against plaintiff on its alleged cause of action, and against defendant on its counterclaim.